WOODY v TAMER

Docket No. 86005. Submitted January 15, 1987, at Detroit. Decided April 6, 1987. Leave to appeal applied for.

James and Kathleen Tamer and Mae Ellen George purchased a country club from Woodrow and Anna Woody on a land contract. The purchasers paid $1,000,000 down, leaving a balance due of $5,500,000, payable in monthly installments of $50,000. The payments were to be made to the Woodys' account at First National Bank In Mt. Clemens, N.A. First National would then make disbursements from the Woodys' account to Metropolitan Savings & Loan, holder of the Woodys' first mortgage on the club, and to the Woodys' mortgage account at First National, holder of a second mortgage on the club. The balance due on the second mortgage was $1,290,000, secured not only by the country club but by a second piece of property the Woodys owned in Florida. The Woodys were personally liable for any deficiencies in the event of default and sale of the two properties. The purchasers subsequently defaulted on the land contract. The resultant lack of payments by the purchasers forced the Woodys to default on their mortgage payments. Meetings and communications between the purchasers and First National resulted in a plan whereby the purchasers would remain in default, forcing the Woodys to relinquish $1,400,000 in equity on the property. Once that occurred First National would extend new credit to the purchasers on the club property. The plan worked, resulting in an agreement transferring all of the Woodys' interest in the property to the purchasers in exchange for a complex restructuring of the Woodys' indebtedness on the property. The Woodys thereafter filed suit against the Tamers, George, and First National in Macomb Circuit

REFERENCES

Am Jur 2d, Contracts §§ 294, 355 et seq.; 425 et seq.; 441 et seq..

Am Jur 2d, Interference §§ 1, 7-9, 11, 12, 50.

Am Jur 2d, Pleading §§ 230 et seq..

Specific performance of land contract notwithstanding failure of vendee to make required payments on time. 55 ALR3d 10.

Liability for procuring breach of contract. 26 ALR2d 1227.

See also the annotations in the Index to Annotations under Pleadings.

Court alleging tortious interference with contractual relations and a conspiracy to injure business relations. The court, Ross W. Campbell, Jr., J., granted defendants' motion for summary disposition on the ground that plaintiffs failed to state a claim upon which relief could be granted. Plaintiffs appealed.

The Court of Appeals *held*:

1. The failure of the purchasers to make monthly payments constituted nonperformance of an obligation due, which is a breach of contract. Plaintiffs therefore properly pled a breach of contract by the Tamers and George.

2. Plaintiffs also properly pled tortious interference with existing contractual relations against the purchasers and First National.

3. The trial court erred in looking beyond the allegations of the pleadings in finding that plaintiffs had no reasonable expectation that First National would refrain from threatening foreclosure or that it would be willing to extend additional credit. Thus the trial court erred in finding that plaintiffs failed to state a cause of action for tortious interference with a business relationship. The allegation that First National encouraged the purchasers to remain in default is a sufficient pleading of intentional interference.

4. The trial court erred in holding that plaintiffs failed to state a derivative claim for civil conspiracy.

Reversed and remanded.

1. CONTRACTS — NONPERFORMANCE OF OBLIGATIONS DUE — BREACH OF CONTRACT.

Nonperformance of an obligation due under a contract is a breach of contract even though the liability of the nonperforming party is limited or nonexistent.

2. TORTS — INTERFERENCE WITH AN EXISTING CONTRACTUAL RELATION — CONTRACTS.

A cause of action for interference with an existing contractual relation is stated where the complaint alleges the existence of a contract, a breach of that contract, and instigation of the breach by the alleged tortfeasor without justification.

3. TORTS — TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP.

The basic elements which establish a prima facie tortious interference with a business relationship are: the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy, knowledge of the relationship or expectancy on the part of the interferer, an intentional interference inducing or causing a breach or termination of the

relationship or expectancy, and resultant damages to the party whose relationship or expectancy has been disrupted.

4. MOTIONS AND ORDERS — SUMMARY DISPOSITION — FAILURE TO STATE A CLAIM.

   A trial court's ruling on a motion for summary disposition for failure to state a claim upon which relief can be granted must be based upon the pleadings alone (MCR 2.116[C][8]).

*Hudnut & Ravitz, P.C.* (by *James H. Hudnut*), for plaintiffs.

*James C. Thomas, P.C.* (by *James C. Thomas*), for James and Kathleen Tamer and Mae Ellen George.

*Hammond, Ziegelman, Roach & Sotiroff, P.C.* (by *Thomas A. Roach* and *Thomas G. Good*), for First National Bank In Mt. Clemens, N.A.

Before: R. M. MAHER, P.J., and SHEPHERD and ALLEN,* JJ.

PER CURIAM. Plaintiffs appeal as of right from the trial court's order of summary disposition entered June 12, 1985, on their claims for tortious interference with contractual relations or prospective business relationships and conspiracy to injure plaintiffs in their business relations. We reverse the decision of the trial court and remand for further proceedings on plaintiffs' claims.

Defendants' motion for summary disposition was brought under MCR 2.116(C)(8), failure to state a claim upon which relief may be granted. We review a trial court's order of summary disposition under that subrule by a familiar standard:

   A motion for summary judgment for failure to

---

* Retired Court of Appeals judge, sitting on the Court of Appeals by assignment.

state a claim upon which relief can be granted is designed to test the legal sufficiency of the claim as determined from the pleadings alone. All factual allegations are accepted as true along with any inferences or conclusions which may fairly be drawn therefrom. The motion should be granted only where the claim is so clearly unenforceable as a matter of law that no factual development can possibly justify a right to recovery. *Attard v Adamczyk,* 141 Mich App 246, 248-249; 367 NW2d 75 (1985). [*Ambro v American National Bank & Trust Co of Michigan,* 152 Mich App 613, 616-617; 394 NW2d 46 (1986).]

Turning to the complaint, then, we find the following factual allegations.

Plaintiffs, Woodrow Woody and Anna Woody (the Woodys), were sole owners of the Hillcrest Country Club (club) located in the City of Mt. Clemens. On or about December 1, 1980, the Woodys sold the club to defendants James and Kathleen Tamer and Mae Ellen George on a land contract.

The Tamers and George obtained both the real and personal property of the club for a total purchase price of $6,500,000. A $1,000,000 down payment was made by the defendant-purchasers, leaving a balance due of $5,500,000 under the land contract. The land contract additionally provided that the purchasers, the Tamers and George, were to bear no personal liability with respect to performance and that the property would be the sole source of security for the transaction.

The balance due on the land contract was to be paid in monthly installments of $50,000. That amount was to be paid to the Woodys' account with defendant First National Bank In Mt. Clemens (First National). Disbursements from the account were to be made by First National to

Metropolitan Savings & Loan, holder of the Woodys' first mortgage on the club, and to the Woodys' mortgage account at First National, holder of a second mortgage on the club.

At the time of sale, December 1, 1980, the balance due on the Woodys' mortgage account with First National was $1,290,000. That amount was secured not only with a mortgage on the club, but also with a mortgage on a second piece of Florida property owned by the Woodys. Plaintiffs were personally liable for any deficiencies in the event of default and sale of the two properties.

The Woodys were dependent upon the payments made by defendants under the land contract on the club to satisfy their monthly obligations on the first and second mortgages. Defendants Tamer and George were well aware of the contractual and financial relationships between the Woodys, First National and Metropolitan Savings & Loan. Defendant First National was well aware of the Woodys' financial relationship with defendants Tamer and George.

Monthly payments of $50,000 were made under the land contract on the club until August 1, 1982. At that time, defendants Tamer and George defaulted on the land contract. They continued in default through March 2, 1983. As a result of the default of defendants Tamer and George, the Woodys were forced to default on their mortgage payments to First National and Metropolitan Savings & Loan. As of January, 1983, the balance due on the land contract was $4,700,000. As of the same date, approximately $1,800,000 was due on the Woodys' first mortgage with Metropolitan Savings & Loan. There is no allegation as to the amount due at that time on the Woodys' second mortgage with First National.

It is alleged, however, that the default by defendants Tamer and George was made expressly for the purpose of causing financial injury to the Woodys with the object of forcing the Woodys into default on the first and second mortgages. It is further alleged that, commencing October 1, 1982, defendants Tamer and George, with the intention of inflicting injury to the plaintiffs, began a course of conduct to complete the injury to the Woodys by meeting and communicating with defendant First National.

As a result of the meetings and communications between defendants, First National embarked upon a course of conduct which included threats of foreclosure on the property and the establishment of personal liability on the part of the Woodys. First National encouraged defendants Tamer and George to continue in default on the land contract, despite their ability to make payments. First National simultaneously offered to extend new credit to defendants Tamer and George on the club property, contingent upon the Woodys' relinquishment of $1,400,000 in equity on the property.

The defendants ultimately succeeded in their plan to force relinquishment of the Woodys' equity. A tripartite agreement, entered by the parties on February 2, 1983, transferred all of the Woodys' interest in the property to defendants Tamer and George in exchange for a complex restructuring of the Woodys' indebtedness on the property. The tripartite agreement made no reference to a settlement of legal actions.

Ten months after the signing of the tripartite agreement, on December 16, 1983, the Woodys brought suit in Macomb Circuit Court, alleging tortious interference with contractual relations and a conspiracy to injure business relations.

### I. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

#### A. THE BREACH OF CONTRACT

It is well established in Michigan law that a prerequisite to an action for tortious interference with contractual relations is a breach of contract. Thus, a discharge from employment under a contract for employment at will has been held to be an insufficient basis upon which to state a claim for tortious interference with a contractual relation. See *Dzierwa v Michigan Oil Co,* 152 Mich App 281, 287; 393 NW2d 610 (1986), and cases cited therein.

In an action based upon a contract, the court may examine the contract in conjunction with a motion for summary judgment for failure to state a claim. *Second Benton Harbor Corp v St Paul Title Ins Corp,* 126 Mich App 580, 585; 337 NW2d 585 (1982). Here, the land contract between the Woodys and defendants Tamer and George precluded personal liability on the part of the defendant-purchasers. Paragraph 13.A of the Agreement of Sale, incorporated by reference into the land contract, specified:

> Each of Purchasers or any heir or legal representative, or any assignee of either Purchaser shall not be personally liable under any obligation under this Agreement or under any note, mortgage, lease, commitment, agreement, contract or other undertaking under this Agreement, all such personal liability, if any, being hereby waived by the Sellers on their behalf and on behalf of all persons claiming by, through or under the Sellers.

Based upon this contractual provision, the trial court concluded that there was no breach of con-

tract when the defendant-purchasers ceased making monthly payments on the club. The trial court reasoned:

> Paragraph 13.A unambiguously gives the Individual Defendants the right either to make all necessary installment payments and retain the property, or to cease making payments at any time, return the property, and forfeit all payments already made. The Individual Defendants had no duty to make payments, but were entitled to either make them or not, as they saw fit.
>
> Under Paragraph 13.A, the Individual Defendants were not bound to continue performing, but the contract was to remain in effect so long as they chose to perform under it. An argument that the contract was void because there was no mutuality of obligation would be ill-founded, however, because the Individual Defendants paid the Woodys $1 million as a down payment, and the Woodys may retain this and all other payments made to them under the contract. See *Western Newspaper Union v Kitchel,* 201 Mich 121, 124-125 (1918).

We believe that this analysis foreshortens the actual provisions of the contract by equating the purchasers' obligation to perform with the extent of their personal liability in the event of a breach of the contract.

The Restatement of Contracts 2d provides:

> Effect of Performance as Discharge and of Non-Performance as Breach
>
> (1) Full performance of a duty under a contract discharges the duty.
>
> (2) When performance of a duty under a contract is due any non-performance is a breach. [2 Restatement Contracts, 2d, § 235, p 211.]

As the comments to this section explain:

b. *Effect of non-performance.* Non-performance is not a breach unless performance is due. Performance may not be due because a required period of time has not passed, or because a condition has not occurred (§ 225), or because the duty has already been discharged (Chapter 12) as, for example, by impracticability of performance (Chapter 11). In such a case non-performance is justified. When performance is due, however, anything short of full performance is a breach, even if the party who does not fully perform was not at fault and even if the defect in his performance was not substantial. *Non-performance of a duty when performance is due is a breach whether the duty is imposed by a promise stated in the agreement or by a term supplied by the court* (§ 204), *as in the case of the duty of good faith and fair dealing* (§ 205). [2 Restatement Contracts, 2d, § 235, Comment b, p 212. Emphasis added.]

See also, 3 Corbin On Contracts, § 570, p 344 (If a purchaser of a business promises to pay therefor out of profits yet to be made, there is an implied promise to keep the business going in good faith).

It should be noted that the above-quoted passage does not provide that performance may not be due because the obligor is not liable for damages. In fact, the duty to perform is distinct from the duty to pay damages for nonperformance or breach:

If the duty of performance, *as distinguished from the duty to pay damages,* has been suspended or discharged, as by impracticability of performance or frustration of purpose, there is then no breach and this Section is not applicable. [3 Restatement Contracts, 2d, § 346, Comment a, p 110. Emphasis added.]

The trial court's analysis in this case assumes that the contract provided for alternative methods of performance. Thus, under the trial court's anal-.

ysis, defendants Tamer and George could perform either by making monthly payments or by turning the property over to the Woodys. Our reading is somewhat different. Paragraph 2 of the land contract entitled "PURCHASER AGREES AS FOLLOWS" clearly specifies that the purchaser shall "pay the seller the sum aforesaid," that being $50,000 per month. No alternative performance is mentioned in paragraph 2. Indeed, the only reference to "forfeiture" or recovery of the property in the land contract is under paragraph 3(a), prefaced by the phrase "If the Purchaser shall fail to perform . . . ." We do not believe that forfeiture can reasonably be construed to constitute alternative performance.

We believe that the land contract in this case is clearly distinguishable from the employment at will contract in *Dzierwa*. Discharge could not constitute a breach in the employment at will contract, since there was no obligation due to provide continuing employment. Here there was an obligation to make monthly payments of $50,000 until the entire balance due of $5,500,000 had been paid.

In sum, our reading of the land contract, incorporated by reference in the complaint, indicates that the failure of the defendant-purchasers to make monthly payments constituted nonperformance of an obligation due. Nonperformance of an obligation due is a breach of contract even though the liability of the nonperforming party is limited or nonexistent. The Woodys have therefore properly pled a breach of contract by defendants Tamer and George.

### B. THE TORT

The elements of the tort of interference with an

existing contractual relation are: (1) the existence of a contract; (2) a breach of the contract; and (3) instigation of the breach by the alleged tortfeasor without justification. *Northern Plumbing & Heating, Inc v Henderson Bros, Inc,* 83 Mich App 84, 92; 268 NW2d 296 (1978), lv den 405 Mich 845 (1979), citing *Dassance v Nienhuis,* 57 Mich App 422, 432-433; 225 NW2d 789 (1975). Here the Woodys have pled the existence of a contract, a mortgage contract with First National. The Woodys also pled that the contract was breached—that they failed to make mortgage payments to First National. Finally the Woodys have pled that their breach of contract was instigated by defendants Tamers' and George's breach of the land contract discussed in Part A, *supra.*

Addressing the Woodys' claim against defendants Tamer and George first, we note that the *Dassance* elements for tortious interference with existing contractual relations were taken from 4 Restatement Torts, § 766. Comment d discusses precisely the factual context presented by the Woodys' pleadings:

> d. *Induces or otherwise purposely causes.* The word "induces" refers to the situations in which A causes B to choose one course of conduct rather than another. Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is willing to suffer the consequences. Thus inducement operates on the mind of the person induced. The phrase "otherwise purposely causes" refers to the situations in which A leaves B no choice, as, for example, when A imprisons or commits such a battery upon B that he cannot perform his contract with C, or when A destroys the goods which B is about to deliver to C. *Such is also the case when performance by B of his contract with C necessarily depends upon the prior*

> *performance by A of his contract with B and A fails
> to perform in order to disable B from performing
> for C.* The rule stated in this Section applies to any
> purposeful causation whether by inducement or
> otherwise. The essential thing is the purpose to
> cause the result. If the actor does not have this
> purpose, his conduct does not subject him to liabil-
> ity under this rule even if it has the unintended
> effect of deterring the third person from dealing
> with the other. It is not necessary, however, that
> the purpose to cause the breach of contract or
> failure to deal be the actor's sole or paramount
> purpose. It is sufficient that he designs this result
> whether because he desires it as an end in itself or
> because he regards it as a necessary, even if
> regrettable, means to some other end . . . . [4
> Restatement Torts, § 766, Comment d, pp 54-55.]

Here the Woodys have pled that performance of
their mortgage agreement with First National
necessarily depended upon performance by defen-
dants Tamer and George on their land contract.
The Woodys have further pled that defendants
Tamer and George breached the land contract in
order to disable the Woodys from performing on
their mortgage with First National. Thus, accord-
ing to the Restatement,[1] the Woodys have stated a
claim.

We agree with the authors of the Restatement
and Restatement 2d that such acts should state a
cause of action. Although what constitutes "im-
proper" conduct of a quality which would be with-
out justification is not clearly defined, 4 Restate-
ment Torts, 2d, § 767, pp 26-28, it is readily appar-
ent that several of the Restatement 2d factors
addressing "improper" conduct are applicable to
these pleadings. We are therefore inclined to allow
a full development of the plaintiffs' case, rather

[1] Under 4 Restatement Torts, 2d, § 766A, p 17, the result is the
same.

than make a determination on the pleadings alone. *Northern Plumbing, supra,* p 94.

The result is the same where the Woodys' claim against First National is analyzed under the *Northern Plumbing* elements. The Woodys have pled: (1) the existence of a contract, this time the land contract on the club; (2) a breach of the land contract by defendants Tamer and George; and (3) that the breach was instigated by defendant First National without justification. See also 4 Restatement Torts, 2d, § 766, pp 7-17. Again we are inclined to believe that an inducement or instigation by First National of a breach of the land contract between the Woodys and defendants Tamer and George would fall under several of the factors suggested in 4 Restatement Torts, 2d, § 767, pp 26-28. The trial court's order of summary disposition on the pleadings as to plaintiffs' claim for tortious interference with contractual relations must be reversed. *Northern Plumbing, supra,* p 94.

### II. TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

The elements of a claim for tortious interference with a business relationship were also set forth in *Northern Plumbing:*

> "The basic elements which establish a prima facie tortious interference with a business relationship are the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted." [*Northern Plumbing & Heating, Inc v Henderson Bros, Inc,* 83 Mich App 84, 93; 268 NW2d 296

(1978), lv den 405 Mich 845 (1979), quoting 45 Am Jur 2d, Interference, § 50, p 322.]

See also *Weitting v McFeeters,* 104 Mich 188, 197; 304 NW2d 525 (1981)(quoting 4 Restatement Torts, 2d, § 766B, p 20 for the elements of the tort).

It is apparent that an advantageous *contractual* relationship is sufficient, but not necessary, to state a cause of action in accordance with this tort. Here the Woodys had an advantageous contractual relationship with First National, in that continuation of their performance under the mortgage would enable them to secure 1.4 million dollars in equity on the club. It is also clear that the Woodys had an advantageous contractual relationship with defendants Tamer and George in that continued performance of those defendants' obligations under the land contract would enable the Woodys to secure the same 1.4 million dollars stake in the club. Indeed, the Woodys allege that the defendants' combined activities were designed to force the Woodys into default on the underlying First National mortgage in order to allow the defendants to renegotiate both instruments and obtain, through a complex of financial arrangements, the Woodys' 1.4 million dollars in equity.

The trial court reasoned, however, that the prospective business relationship was not a reasonable expectancy. Citing *Shipani v Ford Motor Co,* 102 Mich App 606, 622; 302 NW2d 307 (1981),[2] the trial court reasoned that the Woodys had no reasonable expectation that First National would refrain from threatening foreclosure or that First National would be willing to extend additional credit.

---

[2] In *Shipani,* this Court held that the plaintiff had no reasonable expectation of business advantage based upon an at-will employment contract.

We first note that the trial court's conclusions are not based upon the pleadings, but upon the trial court's speculation as to what the mortgage agreement provided. As we noted *supra*, defendants' motion was brought under subrule (6), failure to state a claim. The trial court's ruling under such a motion must be based upon the pleadings alone. *Ambro, supra.* The pleadings clearly alleged that the Woodys were securing 1.4 million dollars in their equity in the club through their financial arrangements with defendants. The trial court erred by looking beyond the allegations of the pleadings.

Furthermore, even if it is assumed that the terms of the mortgage were in accordance with the trial court's speculation, it is not at all clear that the Woodys' expectations were unreasonable. Defendants Tamer and George were contractually bound to make payments under the land contract which were adequate to cover the Woodys' underlying mortgages. While it is true that defendants Tamer and George were not personally liable under the land contract, it is by no means clear that the Woodys would have obtained greater assurance of payment if those defendants had been personally liable. Just as a business may fail, and there is no allegation here that the club was failing, personal assets may dissipate. The fact remains that defendants Tamer and George were contractually bound to the business relationship. Leaving aside the factual question of liquidity, there can be no more reasonable expectation of business advantage than that based upon a valid contract.

Again assuming that the mortgage terms allowed First National to threaten foreclosure and refuse further credit, we note that those actions are not the gravamen of the Woodys' pleadings.

Instead, the Woodys have pled that First National encouraged defendants Tamer and George to remain in default in order to force terms under which the Woodys would relinquish 1.4 million dollars of equity in the club. As noted *supra,* a valid contract is a sufficient, but unnecessary, basis for this tort. *Northern Plumbing, supra.* Thus, the "intentional interference" need not be a breach of contract on the part of First National. We hold that the allegation that First National encouraged defendants Tamer and George to remain in default is a sufficient pleading of intentional interference.

The trial court's opinion does not address the Woodys' claim against defendants Tamer and George under the same theory. However, it is clear to us that the Woodys have alleged that those defendants interfered with the plaintiffs' business relationship with First National by deliberately breaching and remaining in default on their land contract, thus forcing the Woodys into default on the underlying mortgage. As noted in Part IA, *supra,* that breach was a violation of the duty of defendants Tamer and George under the land contract. Since continued performance by the Woodys under their mortgage would have precluded foreclosure and obviated the need for a further extension of credit, we would conclude that the Woodys' expectation of business advantage was reasonable.

We therefore hold that the trial court erred in granting summary judgment to the defendants under MCR 2.116(C)(8) on the Woodys' claim for tortious interference with a business relationship.

### III. CIVIL CONSPIRACY

Finally, the trial court held that defendants had

failed to state a derivative claim in accordance with MCR 2.116(C)(8) for civil conspiracy because there was no allegation of a wrongful act. As noted *supra* the Woodys have properly pled claims for tortious interference with contractual relations and tortious interference with a business relationship. Thus we conclude that the trial court erred in holding that plaintiffs failed to state a derivative claim for civil conspiracy. See *Brown v Brown,* 338 Mich 492; 61 NW2d 656 (1953), and *Bahr v Miller Bros Creamery,* 365 Mich 415, 427; 112 NW2d 463 (1961). We therefore reverse the trial court's order of summary disposition on the civil conspiracy claim as well.

Reversed and remanded. We do not retain jurisdiction.