*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RELATIVE TIME FILMS, LLC and JEAN-CLAUDE LEWIS,

Plaintiffs-Appellants,

v

COVENANT HOUSE MICHIGAN, COVENANT HOUSE ACADEMY DETROIT, and YOUTH VISION SOLUTIONS,

Defendants-Appellees.

FOR PUBLICATION
November 10, 2022
9:20 a.m.

No. 359645
Wayne Circuit Court
LC No. 19-012909-CB

Before: RIORDAN, P.J., and BOONSTRA and GADOLA, JJ.

RIORDAN, P.J.

Plaintiffs Jean-Claude Lewis and his film-production company, Relative Time Films, LLC, appeal as of right the trial court's order granting summary disposition of their two-count complaint in favor of defendants Covenant House Michigan, Covenant House Academy Detroit, and Youth Vision Solutions, implicitly pursuant to MCR 2.116(C)(10). On appeal, plaintiffs argue that the trial court erred in its reasoning and that the other grounds for summary disposition raised by defendants in the trial court, but not addressed below, are meritless. We disagree and affirm the trial court.

## I. FACTS

Plaintiff Jean-Claude Lewis is the sole shareholder of plaintiff Relative Time Films, LLC, a film-production company. At the time relevant to this case, plaintiff Lewis was a member of the board of directors of defendant Covenant House Academy Detroit, a public-school charter academy. Defendants Covenant House Michigan and Youth Vision Solutions are related nonprofit organizations that provide shelter, aid, and education to students in need.[1]  In about July 2015,

---

[1] Defendants' brief on appeal explains that

plaintiff Lewis learned that a student at Covenant House, Gena Turner, apparently had significant artistic talent.[2] In August 2015, plaintiff Lewis met with Turner, which resulted in her signing two contracts during the meeting. The first contract provided that Turner would convey to plaintiffs the exclusive licensing rights to a film production about her life story.[3] The second contract provided that Motorwood Entertainment, LLC, would manage her affairs with regard to the film

---

Covenant House Michigan ("Covenant") is a part of Covenant House, the largest, mostly privately-funded consolidated agency in the Americas providing housing, food, immediate crisis care, and an array of supportive services to children and youth facing homelessness. . . . Covenant began its operations with community service centers, outreach programs, and vocational programs, and within a few years opened two homeless shelters in the Detroit area . . . that together can house up to 75 at-risk youth.

Covenant's mission has always been to give at-risk children and youth hope by providing them housing, support services and education so that they can become stable, confident and independent adults. As part of its mission, Covenant opened Covenant House Academy Detroit ("CHAD") in 2005. CHAD has three charter schools in east and southwest Detroit for youth and young adults ages 15-22. The students who attend CHAD are facing homelessness and do not have high school diplomas. . . .

Youth Vision Solutions ("YVS"), which provides the education management services for CHAD's charter schools in Detroit, is a nonprofit corporation that provides education management services to public school academies in Michigan. YVS was created for the purpose of contributing to the advancement of education by developing educational programs and initiatives that are more effective than traditional curricula at preparing children, especially at-risk children residing in urban centers, to succeed educationally, emotionally, economically, and physically. . . .

[2] Documents attached to plaintiffs' February 28, 2020 initial disclosures indicate that Turner became involved with defendants due to "many experiential stressors including chronic financial problems, multiple changes in residences/schools and a paucity of familial support in affiliation with their own personal struggles." She originally had difficulty in school, but her grades improved with additional educational services.

[3] We note that although the first contract nominally referred only to plaintiff Lewis, it is undisputed that it essentially applied to plaintiff Relative Time Films, LLC, as well. The "Option Purchase Format" provided that Turner conveyed "the exclusive and irrevocable right to purchase the motion picture, television and all allied, ancillary and subsidiary rights" to plaintiffs for $1.00. It further provided that plaintiffs would pay Turner a 2.5% share of the purchase price of "a development deal with a television network or a major studio."

production.  When entering the contractual arrangements, Turner, then age 19, did not have counsel or any other type of representation during plaintiff Lewis's meeting with her.

Within days, plaintiff Lewis's conduct became the subject of controversy within the board of directors of defendant Covenant House Academy Detroit, among others.  Gerald Piro, executive director of defendant Covenant House Michigan, and Michael Krystyniak, superintendent of defendant Covenant House Academy Detroit, discussed the matter with plaintiff Lewis.  They urged plaintiff Lewis to either rescind the contracts or at least allow Turner the opportunity to consult with an attorney to reconsider the contracts.  In addition, they questioned whether plaintiff Lewis inappropriately used his position and attendant influence over Turner to exploit her for his personal gain.[4]  Ultimately, one or more of the defendants provided Turner with an attorney, which eventually resulted in her successfully suing to void the management contract with Motorwood Entertainment, LLC, in 2017.

The anticipated film about Turner's life journey never was produced.  Instead, in September 2019, plaintiffs commenced the instant action against defendants, claiming that defendants tortiously interfered with their production contract with Turner.  Plaintiffs alleged that "defendants were not happy that they were not going to be able to profit from the venture themselves, and therefore engaged in a lengthy battle with plaintiffs that ultimately resulted in [Turner] refusing to honor the contract that she had with plaintiffs."  They alleged that defendants provided Turner with an attorney to "encourage[] her to sue to get out of the contract[s] she entered into," and "by the time defendants finally allowed the litigation to be dropped, the damage had been done and [Turner] refused to co-operate in the making of a film about her life, causing a breach of the contract that she had entered into with plaintiffs."  Accordingly, plaintiffs sought damages exceeding $25,000 for the lost profits of the anticipated film.[5]

---

[4] The parties' briefs on appeal do not discuss whether plaintiff Lewis violated any written conflict-of-interest agreement by having Turner sign the contracts at issue.  Statements made by plaintiff Lewis at the 2015 meeting with Piro and Krystyniak imply that board members of defendant Covenant House Academy Detroit, including plaintiff Lewis, were required to disclose any potential conflict of interest to the board.  According to plaintiff Lewis, "I need to put yes or no here whether I am receiving monies from the Covenant House, which I'm not, but it's through her, but I asked that question [of counsel] specifically just so I'll know which one to check so it's accurate, but it doesn't matter which one I check, it's disclosure."  Thus, it appears that plaintiff Lewis did not technically violate a written conflict-of-interest agreement with defendants, if one existed.  However, the general appearance of impropriety—plaintiff Lewis using his position for personal financial benefit—is readily and starkly apparent.  Further, we note that plaintiff Lewis, as a member of the board of directors of defendant Covenant House Academy Detroit, a public-school charter academy, presumably owed that institution a fiduciary duty under MCL 450.2541 of the Nonprofit Corporation Act, MCL 450.2101 *et seq.*, or MCL 380.634 and MCL 380.1203 of the Revised School Code, MCL 380.1 *et seq.*, to avoid conflicts of interest.

[5] Plaintiffs also maintained an abuse-of-process claim against defendants, but the trial court dismissed that claim and plaintiffs do not pursue it on appeal.

Defendants moved for summary disposition under MCR 2.116(C)(4) (lack of subject-matter jurisdiction), (C)(8) (failure to state a claim), and (C)(10) (no genuine issue of material fact). The trial court granted summary disposition in favor of defendants, reasoning that "it is beyond factual dispute that Lewis' rights under the . . . [production contract] have been terminated in prior proceedings. Thus, Defendants could not be said to have interfered with Lewis' rights under that contract, which precludes liability on the theories pled in the complaint."

This appeal followed.

## II. STANDARD OF REVIEW

"We review a trial court's decision on a motion for summary disposition under MCR 2.116(C)(10) de novo."[6] *Candler v Farm Bureau Mut Ins Co of Mich*, 321 Mich App 772, 777; 910 NW2d 666 (2017). "A motion under this court rule tests the factual sufficiency of the complaint." *Id*. (quotation marks and citation omitted). "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. (quotation marks and citation omitted). "Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).

## III. DISCUSSION

"In Michigan, tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy." *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 89; 706 NW2d 843 (2005). "The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Id*. at 89-90. Damages is an element as well. *Id*. at 90.

With regard to the third element, "[o]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 382; 689 NW2d 145 (2004) (quotation marks and citation omitted). "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances." *Knight Enterprises v RPF Oil Co*, 299 Mich App 275, 280; 829 NW2d 345 (2013) (quotation marks and citation omitted). "If the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *Id*. (quotation marks and citation omitted). "No categorical answer can be made to

---

[6] Although the trial court did not specify whether it granted defendants' motion under MCR 2.116(C)(8) or (C)(10), because it considered matters outside the pleadings, we interpret the order as granting the motion under subrule (C)(10). See *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012).

the question of what will constitute justification, and it is usually held that this question is one for the jury." *Wilkinson v Powe*, 300 Mich 275, 283; 1 NW2d 539 (1942). "Justification exists where the defendant acted on an equal or superior right." *Greenwald v Greenwald*, 480 Mich 1158, 1158 (2008) (quotation marks and citations omitted).

We agree with plaintiffs that there is a genuine issue of material fact concerning the first and second elements of the claim.[7] However, with regard to the third element, an unjustified instigation of the breach by the defendant, while there is a genuine issue of material fact as to whether defendants instigated the breach, there is no genuine issue as to whether the instigation was unjustified, as we find defendants' actions to be privileged.[8]

Section 770 of the Second Restatement of Torts, which is titled *Actor Responsible for Welfare of Another*, provides as follows:

> One who, charged with responsibility for the welfare of a third person, intentionally causes that person not to perform a contract or enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if the actor
>
> (a) does not employ wrongful means and
>
> (b) acts to protect the welfare of the third person.

*Comment b.* to that section further explains:

> *Relation between actor and person induced.* The rule stated in this Section deals with cases in which, by ordinary standards of decent conduct, one is charged with some responsibility for the protection of the welfare of another. It does not apply to an officious assumption of responsibility. The welfare that is the subject of the actor's responsibility may be physical, moral or economic welfare. The responsibility may exist in such relationships as those of parent, or person standing in loco parentis, and child, of minister and member of his congregation, attorney and client, teacher and pupil or of employer and employee. The rule stated is frequently applicable to those who stand in a fiduciary relation toward another, as

---

[7] We also agree with plaintiffs that the trial court had jurisdiction because the amount in controversy exceeded $25,000, see *Hodge v State Farm Mut Auto Ins Co*, 499 Mich 211, 223-224; 884 NW2d 238 (2016), and that the trial court erred in reasoning that the production contract had been voided in prior litigation. The record showed that the management contract, not the production contract, had been voided in prior litigation.

[8] Although the trial court did not grant summary disposition in favor of defendants on this basis, we will not reverse the trial court when it reaches the right result for the wrong reasons. See *Elia Companies, LLC v Univ of Mich Regents*, 335 Mich App 439, 446; 966 NW2d 755 (2021).

in the case of agents acting for the protection of their principals, trustees for their beneficiaries or corporate officers acting for the benefit of the corporation.

In addition, *comment e.* explains:

> *Actor's purpose.*  The rule stated in this Section applies to protect the welfare of the person induced.  If the actor's conduct is not directed to this end, he is not protected by this rule.  His conduct is not so directed if he does not believe that danger to that welfare is threatened by the relation that he seeks to sever or prevent.

The facts of this case fit within § 770.[9]  Defendants, as the nonprofit entities responsible for housing and educating Turner, a person who entered the Covenant House programs because of her unfortunate family circumstances, impoverishment, homelessness, chronic school absenteeism, and intellectual challenges, were "charged with responsibility for the welfare of a third person."  Indeed, plaintiff Lewis himself acknowledged during the 2015 meeting that defendants' responsibility is "to take care of the kids here."  Although plaintiffs correctly argue on appeal that defendants did not have a "fiduciary" duty to Turner, plaintiffs do not dispute that defendants had a responsibility for Turner akin to a "teacher-pupil" relationship due to Turner's enrollment in the Covenant House programs and the fact she was living in Covenant House's residential program.

Further, the record shows that defendants did not "employ wrongful means," such as fraud or violence, to interfere with the production contract between plaintiffs and Turner.  See Second Restatement of Torts, § 767, *comment c.* (explaining that "fraud and physical violence" are "improper" conduct), and plaintiffs do not suggest otherwise.

Finally, and most importantly, the undisputed evidence shows that defendants acted "to protect the welfare of the third person."  Turner was not represented or aided by an attorney or other representative when she signed the production contract with plaintiffs, and the 2015 meeting is rife with instances of Piro explaining that defendants would prefer to provide Turner with an attorney to help aid her understanding in this regard.  For instance, Piro informed plaintiff Lewis that

> it's a legal document and it does outline payment and proceeds and releasing all rights to her name, to you and to your company.  So it's pretty professional.  So going to the -- on a professional level, um, she has had no one to advise her about

---

[9] Although § 770 of the Second Restatement of Torts apparently has not yet been cited by a Michigan court, this Court has cited and adopted related sections of the Second Restatement of Torts that also address tortious interference with a contract.  For example, in *Winiemko v Valenti*, 203 Mich App 411, 416; 513 NW2d 181 (1994), P.J. GRIFFIN, on behalf of this Court, discussed and applied §§ 766B and 767 of the Second Restatement of Torts.  See also *Woody v Tamer*, 158 Mich App 764, 775-776; 405 NW2d 213 (1987) (citing § 766 of the Second Restatement of Torts). Following the reasoning in this line of cases, we adopt § 770 today.

-6-

this. So probably at the very least, she should've had counsel from an entertainment attorney about what this all means.

> So of course, Cynthia asked her, so what -- what did you think you signed? She couldn't repeat one piece of it. She couldn't explain to her what -- she -- she kept stuttering and stuttering. So my concern is the emotional impact and I know it's yours too, the emotional impact that this had on this young lady who is --

Later, Piro added:

> [W]hen I read the part about the film, uh, I guess this whole thing has taken me aback a little bit, because, you know, we're so used to trying to manage the affairs of these young people here. They have no credit rating, they have no social security number . . . . And so now to have this very official, legal binding contract put in front of this young lady, it makes us nervous that did she fully understand what she was signing . . . .

Piro reiterated that "what I think would be fair would that she have legal representation that we would provide to guide her. She has no idea about how much she should be getting or should -- should she hit it big or she has no concept."

In light of these statements, as well as the fact that defendants are nonprofit entities charged with housing and educating students in need of assistance such as Turner, it is clear that defendants acted "to protect the welfare of the third person," i.e., Turner, by providing her with an attorney to assess her contracts with plaintiffs. Therefore, in concert with § 770 of the Second Restatement of Torts, there was no unjustified instigation of the breach by defendants because they were privileged to do so.[10]

Plaintiffs' only response to the above reasoning is to point out that Piro briefly stated during the 2015 meeting that "you stand to profit from it, we don't," and Krystyniak briefly stated that

---

[10] Plaintiffs contended at oral argument that defendants did not submit sufficient documentary evidence to support their motion for summary disposition. Therefore, plaintiffs argue, defendants necessarily failed to satisfy their burden as the moving parties. See *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). However, it never has been disputed during these proceedings that defendants were responsible for Turner's education and care. Plaintiffs acknowledge in their complaint that Turner was a student at defendant Covenant House Academy Detroit, and various documents submitted to the trial court provide additional detail about the relationship between Turner and defendants. Moreover, plaintiffs have not disputed that the record of the 2015 meeting with Piro and Krystyniak accurately reflects defendants' stated motivations for providing Turner with an attorney and otherwise becoming involved in the matter. The trial court was permitted to consider this evidence when deciding the motion for summary disposition, see MCR 2.116(G)(5), and we may now consider it on appeal. Despite some of the more nuanced factual issues being less than clear from the record before us, the only factual issues with which we are concerned today are undisputed by the parties.

"[t]he things that are on my mind are -- and I'm looking at it as if someone were looking from outside . . . I think they'd be looking for like if anybody's going to personally profit from this and, you know, was it our position . . . that put us in the position to profit from it." Plaintiffs argue that these statements at least create a question of fact as to whether defendants sought to interfere with the production contract because they were motivated by their own self-interest of avoiding a public appearance of impropriety, and not motivated by Turner's interests.[11] This argument misses the mark because this Court has stated, in the context of ordinary business competition, that "[i]t generally does not constitute improper interference with a contract if a defendant simply takes the initiative to gain an advantage over the competition." *Knight Enterprises*, 299 Mich App at 282 (quotation marks and citation omitted). In other words, a defendant may, in some circumstances, "interfere" with a contract for its own financial benefit without that motive being deemed "unjustified." It follows here that defendants were justified in "interfering" with a contract, i.e., the production contract, to protect their public reputation from accusations of self-dealing and conflict of interest.[12] This is particularly true where defendants are not profit-seeking corporate entities, but nonprofit entities charged with the well-being, housing, and education of individuals such as Turner.[13]

For these reasons, as articulated by § 770 of the Second Restatement of Torts, we conclude that defendants were privileged to interfere with the production contract between plaintiffs and

---

[11] Plaintiffs also argue that these statements suggest that defendants were motivated to obtain the anticipated film's profits for themselves. This, however, completely fails to consider the statements in context. When the statements are read and understood in context, defendants were concerned with the appearance of self-dealing and conflict of interest, not about directing the profits to themselves.

[12] The Alaska Supreme Court has explained that § 770 of the Second Restatement of Torts does not apply when the defendant's actions "were predominately motivated . . . by spite, malice, or some other improper objective." *Geolar, Inc v Gilbert/Commonwealth Inc of Mich*, 874 P2d 937, 941 (Ak, 1994). Defendants' motivations in this case cannot be remotely characterized as "spite, malice, or some other improper objective."

[13] We acknowledge that Turner was 19 years old when she signed the contracts, so defendants were not *in loco parentis* to her at the time. In addition, there was no written fiduciary relationship between any one of the defendants and Turner. However, defendants undoubtedly had a supervisory relationship to Turner, perhaps even more so than that with a student residing at a preparatory school or in a college dormitory. As noted, Turner experienced homelessness and other personal issues before defendants provided her with shelter and educational opportunities, which her family was unable to provide. Thus, while defendants were not *in loco parentis* to Turner in the technical, legal sense when she signed the contracts because she was an adult at the time, defendants had similar responsibilities for Turner. Indeed, the lower-court record clearly shows that several of defendants' teachers and other agents assumed a personal interest in her stability and success. Moreover, although § 770 of the Second Restatement of Torts is "frequently applicable" to fiduciary relationships, the existence of such a relationship is not a prerequisite to invoking that section.

Turner.  Accordingly, we find there is no genuine issue of material fact as to the third element of plaintiffs' tortious interference with a contract claim, and defendants were entitled to summary disposition on this basis.[14]

## IV.  CONCLUSION

There is no genuine issue of material fact as to the third element of plaintiffs' tortious interference with a contract claim.  As we adopt the reasoning of § 770 of the Second Restatement of Torts, there was no unjustified instigation of the breach by defendants.  Therefore, we affirm the trial court on this alternate basis.

/s/ Michael J. Riordan
/s/ Mark T. Boonstra
/s/ Michael F. Gadola

---

[14] We note that in their brief on appeal, plaintiffs cite multiple cases in which this Court or our Supreme Court held that there was a genuine issue of material fact with respect to the third element of the claim at issue.  Each of those cases, however, involve ordinary competing economic interests with no unusual relationship between the defendant and the third party.  See, e.g., *Patillo v Equitable Life Assur Soc of US*, 199 Mich App 450, 457-458; 502 NW2d 696 (1992) (involving an at-will employment contract); *Winiemko v Valenti*, 203 Mich App 411, 413-414; 513 NW2d 181 (1994) (involving a partnership agreement).  This case, in contrast, involves nonprofit entities that are specifically charged with the well-being, housing, and education of students of extraordinary circumstances and need.