**In re James R. LIVINGSTON and Christy L. Livingston, Debtors.**

**National Sign and Signal, Plaintiff,**

v.

**James R. Livingston, Defendant.**

**Bankruptcy No. HK 05–20536.**

**Adversary No. 06–80194.**

United States Bankruptcy Court, W.D. Michigan.

Dec. 18, 2007.

---

**3.** Provided R.B.K. repays the avoided payment to the trustee. 11 U.S.C. § 502(d).

Stephen L. Langeland, Esq., Kalamazoo, MI, for Plaintiff.

Cody H. Knight, Esq., Kalamazoo, MI, for Defendant.

## OPINION

JEFFREY R. HUGHES, Bankruptcy Judge.

National Sign and Signal ("NSS") objects to the dischargeability of its claim against Debtor James Livingston. NSS' objection is based upon Sections 523(a)(2)(A), (a)(4) and (a)(6).[1]

The matter was tried on June 18, 2007. Although both parties appeared and argued their respective positions, no witnesses were called. Rather, the parties simply stipulated to testimony given by witnesses in a prior state court action.[2] The parties also stipulated to the admission of all exhibits.[3]

---

1. 11 U.S.C. §§ 101, *et seq.* Debtors' petition pre-dates the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L. No. 109–8, § 1501(b)(1), 119 Stat. 23. Unless otherwise indicated, all citations in this opinion to the Bankruptcy Code will be to the Bankruptcy Code as written prior to the BAPCPA amendments. The citation will be simply "Section ____" if the amendments have not changed the enumeration. However, if the enumeration has been changed, then the citation will be "Section ____ (pre-BAPCPA)."

2. The witnesses were Gerald W. Carrier, Joseph Kennedy, Cyndy Hood, Rodney L. Crawford and Ronald E. Scherer.

3. The admitted exhibits are the seven documents attached as Exhibits 1 through 7 to NSS' list of exhibits filed on October 26, 2006 (Dkt. No. 15), the three documents attached to the June 19, 2007 stipulation that was filed in conjunction with this adversary proceeding (Dkt. No. 35), and the verified complaint, verdict form and judgment on jury verdict entered in the prior state court action that are

What follows are my findings of fact and conclusions of law made pursuant to FED. R.BANKR.P. 7052.[4] For the reasons given, the requested relief is denied.

## FACTS

NSS manufactures illuminated street and traffic signs. Most of its product is used in public projects. NSS generates sales by working with the consultants who compete for those projects. NSS relies upon the consultants to incorporate its product into their bids.

NSS had particularly close ties with three consulting firms: Carrier & Gable, C.J. Hood Company, and Traffic Products. Although NSS had written agreements with two of these firms, the agreements had in reality little practical value because they could be terminated at will on only 30-days notice. What was more important to NSS were the informal relationships it had developed with all three firms as they worked together over the years.[5]

Mr. Livingston was a long time NSS employee. He was also a vice president. His responsibilities included managing the business generated by NSS' consultants. Consequently, Mr. Livingston had developed his own close relationships with Carrier & Gable, C.J. Hood Company, and Traffic Products.

Mr. Livingston, together with George Lebbos, NSS' then president, arranged for a secret meeting with Gerald Carrier of Carrier & Gable and Cyndy Hood of C.J. Hood Company sometime during the first weeks of August 1995. Mr. Lebbos and Mr. Livingston advised Mr. Carrier and Ms. Hood at the meeting that they were leaving NSS to start their own company. They also inquired whether either Mr. Carrier or Ms. Hood would be interested in investing in their new company.

Nothing was agreed upon at that meeting. However, both Mr. Lebbos and Mr. Livingston left NSS shortly after the secret meeting and Mr. Carrier did invest in their new company. Mr. Kennedy of Traffic Products, Incorporated also invested some time later. Only Ms. Hood remained loyal to NSS.

NSS thereafter sued Mr. Lebbos and Mr. Livingston in state court. It alleged in its complaint that both men (1) had breached their fiduciary duties to NSS; (2) had misappropriated NSS' trade secrets; (3) had been grossly negligent in their management of NSS' business; (4) had tortiously interfered with NSS' business relationships; and (5) had unfairly competed with NSS.

A jury ultimately returned a $1.8 million judgment against Mr. Livingston in the state court action. The jury disclosed in its answers to an accompanying questionnaire that Mr. Livingston had in fact breached his fiduciary responsibilities to NSS and that he had also unlawfully interfered with NSS' business relationships. It further indicated that both transgressions warranted the $1.8 million judgment However, while the jury concluded that Mr. Livingston had also misappropriated NSS' trade secrets, it determined that NSS had not been damaged as a result. In other words, NSS would have been awarded nothing had it proceeded against Mr. Liv-

---

attached as Exhibits 1–3 to NSS' trial brief filed on June 5, 2007 (Dkt. No. 31).

**4.** Unless otherwise indicated, all further citations in this opinion to "Rule ____" will be to the Federal Rules of Bankruptcy Procedure.

**5.** Mr. Livingston's dispute with NSS arose in 1995. By that time, both Traffic Products and Carrier & Gable had been incorporating NSS' product into their bids for 15 years and C.J. Hood had been incorporating NSS' product into its bids for 10 years.

ingston on the misappropriation count alone.[6]

## DISCUSSION

■ The jury verdict is res judicata with respect to the indebtedness owed by Mr. Livingston to NSS. Consequently, Mr. Livingston cannot now collaterally attack the amount of NSS' claim against him. On the other hand, the verdict is not res judicata with respect to the separate question of whether NSS' claim is excepted from the discharge Mr. Livingston has already been granted as part of this bankruptcy proceeding.[7] Res judicata requires that there be an identity between the claim currently being adjudicated and the claim that gave rise to the judgment being relied upon. In this instance, that identity is lacking because the claim before this court relates to the bankruptcy issue of non-dischargeability whereas the prior claims before the state court related to liability and amount *See, Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

■ However, Mr. Livingston may still be collaterally estopped from contesting particular elements of NSS' non-dischargeability claims against him. *See, Bay Area Factors v. Calvert (In re Calvert),* 105 F.3d 315 (6th Cir.1997). Generally, if an issue in a pending claim for non-dischargeability was also a dispositive issue in a previously litigated matter between the same parties, then neither party may re-litigate that issue. Rather, both parties will be bound by the determination already made. *Id.* at 317–320.

### A. *Section 523(a)(2)(A).*

Section 523(a)(2)(A) states that an individual's debt is not subject to a discharge entered under Section 727 if that debt was:

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

■ The stipulated transcripts and exhibits clearly establish that it was Mr. Livingston's secret dealings with NSS' consultants while still in NSS' employ that convinced the jury that Mr. Livingston had interfered with NSS' business relationships and that he had otherwise breached the fiduciary duties he owed to NSS. I also agree with the Seventh Circuit's observation that the fraud contemplated by Section 523(a)(2)(A) covers the entire spectrum of what can be described as deceitful behavior. *McClellan v. Cantrell,* 217 F.3d 890 (7th Cir.2000). Therefore, Mr. Livingston is collaterally estopped by the prior jury verdict from denying that he had defrauded NSS within the meaning of Section 523(a)(2)(A).

■ However, deceit alone is not sufficient to except a claim from discharge under Section 523(a)(2). Rather, the debtor's fraud must also have been directed towards obtaining "money, property, services, or an extension, renewal or refinancing of credit" from the victim. In this

---

**6.** The questionnaire did not cover the remaining two counts of NSS' complaint, they being that Mr. Lebbos and Mr. Livingston had grossly mismanaged NSS and that they had unfairly competed with it. It is likely that the state court had already disposed of these two counts prior to trial. In any event, their absence from the questionnaire permits the inference that neither of these remaining

counts factored into the jury's $1.8 million verdict.

**7.** This court granted Mr. Livingston's discharge on February 17, 2006. However, NSS' timely complaint under Section 523 gives it the opportunity to avoid the consequences of that discharge.

instance, there is no evidence that Mr. Livingston gained any property from NSS as the result of his deceit. At most, the record establishes that two consultants, Carrier & Gable and Traffic Products, terminated their relationship with NSS because of solicitations made by Mr. Livingston while he was still employed by NSS. Although the prior jury clearly found that his conduct was reprehensible and that NSS was injured as a consequence, the jury did not find, nor does the record otherwise support a finding, that Mr. Livingston's deceit resulted in either he or his new company acquiring money, property, services or an extension of credit from NSS.

Therefore, NSS is not entitled to a declaration of non-dischargeability under Section 523(a)(2)(A).

B. *Section 523(a)(4)*.

■ Section 523(a)(4) excepts from an individual's discharge under Chapter 7 any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." NSS contends that the $1.8 million jury verdict against Mr. Livingston meets the Section 523(a)(4) exception because Mr. Livingston is an embezzler.[8] However, Mr. Livingston's conduct cannot be characterized as embezzlement. Mr. Livingston unquestionably meddled with the relationships NSS had established with at least two of its consultants. However, Mr. Livingston did not embezzle those relationships.

NSS cites *Digital Commerce, Ltd. v. Sullivan (In re Sullivan)*, 305 B.R. 809 (Bankr.W.D.Mich.2004) for the proposition that something as intangible as a corporate opportunity can be embezzled. However, even *Sullivan* recognizes that an embezzlement can only occur if in fact there has been a taking of property and what NSS claims Mr. Livingston embezzled falls well outside even *Sullivan's* broad definition of property. At best, the only property that Mr. Livingston could have arguably embezzled were the two contracts NSS had with Carrier & Gable and Traffic Products, Incorporated. Nothing, though, suggests that Mr. Livingston "took" either of these contracts from NSS. Rather, it appears that each contract was simply terminated by one party or the other. NSS suffered damage only because Mr. Livingston also disrupted the informal, noncontractual relationships that NSS had developed with these consultants over many years of doing business.

Therefore, NSS is not entitled to a declaration of non-dischargeability under Section 523(a)(4).

C. *Section 523(a)(6)*.

■ Section 523(a)(6) states that an individual debt is not subject to the discharge entered under Section 727 if that debt was:

> for willful and malicious injury by the debtor to another entity or to the property of another entity.

The prior jury already determined that Mr. Livingston had engaged in tortious conduct, that being his intentional interference with NSS' business relationships. Consequently, Mr. Livingston is collaterally estopped from denying that this conduct

**8.** It would appear, at first blush, that NSS' claim might also fit within the fiduciary portion of this exception because of the jury's finding that Mr. Livingston had breached the fiduciary duties he owed to NSS as an officer and employee. However, the Sixth Circuit has limited the application of Section 523(a)(4) to only instances where the fiduciary responsibilities are associated with either an express or a technical trust. *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 391 (6th Cir.2005); *see also, R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 178–79 (6th Cir.1997).

was both willful and malicious.[9] It makes no difference whether Mr. Livingston actually intended to harm NSS when he persuaded NSS' consultants to associate with his new company. That he chose to engage in tortious conduct is enough under Section 523(a)(6) to hold him accountable for whatever injury that conduct may have caused either to NSS or its property. As the panel observed in *Monsanto Company v. Trantham (In re Trantham)*:

> It is true that the district court also found that there was no evidence to suggest Trantham was specifically motivated by an intent to injure Monsanto. However, that finding is not particularly relevant when reviewing the second part of the test because the same can be said of almost any intentional tortfeasor, for example, a bank robber. His chief motive is to enrich himself, not financially injure the bank. The injury, however, is bound to occur, and in civil terms it constitutes an intentional tort against the bank.

304 B.R. 298, 307 (6th Cir. BAP 2004).

However, as willful and malicious as Mr. Livingston's interference may have been, I conclude that the damages arising from his tortious conduct nonetheless remain outside the scope of the Section 523(a)(6) exception to discharge.

I first address whether Mr. Livingston's conduct resulted in injury to NSS' property. Property is a term used elsewhere in the Bankruptcy Code, most notably in Section 541(a)(1). That subsection, of course, refers to property in terms of the debtor's legal and equitable interests in the same.[10] If, though, property is defined by whether the interest is enforceable under the law, it follows that there can be no injury to property under Section 523(a)(6) unless the victim had some enforceable right in whatever was the object of the debtor's tortious conduct. For example, had Mr. Livingston interfered with a valuable right NSS had under a contract with one of its consultants, then NSS' damages resulting from that interference would have fallen within the ambit of this subsection. However, NSS' contractual rights with the two consultants Mr. Livingston lured away were unimportant Each could terminate its relationship with NSS at will with very little notice.

What the jury did find, though, was that Mr. Livingston had tortiously interfered with the longstanding but unenforceable business relationships NSS enjoyed with these consultants. Indeed, Michigan law distinguishes the particular tort for which Mr. Livingston was found liable, that being tortious interference with an advantageous relationship or expectancy, from the separate tort of tortious interference with contract, based upon the very fact that the latter must involve interference with enforceable rights whereas the former need not.

> The parties in this case at times seem to treat the torts of interference with an advantageous business relationship and interference with an existing contract as synonymous. These torts, however, are distinct. The elements of the latter tort are: (1) the existence of a contract; (2) a

---

9. The jury found that Mr. Livingston had intentionally misappropriated trade secrets as well. While such conduct also represents willful and malicious conduct, it is irrelevant for purposes of this proceeding because the jury determined that NSS had not incurred any damages as the result of Mr. Livingston's misappropriation of those secrets.

10. Justice O'Connor, in a different context, described property as a bundle of sticks, with each stick representing a separate legal right. *U.S. v. Craft*, 535 U.S. 274, 278, 122 S.Ct. 1414, 1420, 152 L.Ed.2d 437 (2002) (quoting Cardoza, *Paradoxes of Legal Science* 129 (1928)).

breach of the contract; and (3) instigation, without justification, of the breach by the alleged tortfeasor. *Woody v. Tamer*, 158 Mich.App. 764. 773–774, 405 N.W.2d 213 (1987). Regarding the tort of interference with an advantageous relationship or expectancy, "an advantageous *contractual* relationship is sufficient, but not necessary, to state a cause of action." *Id.*, at p. 777, 405 N.W.2d 213.

*Bonelli v. Volkswagen of America, Inc.*, 166 Mich.App. 483, 496 n. 4, 421 N.W.2d 213 (1988) (citations omitted); *see also, Badiee v. Brighton Area Schools*, 265 Mich.App. 343, 365–67, 695 N.W.2d 521 (2005).

In this instance, there is no indication that Mr. Livingston had done anything more than interfere with the informal relationships NSS had with its consultants. Therefore, there is no basis for finding that Mr. Livingston had injured any of NSS' property.

However, Section 523(a)(6) also covers debts involving willful and malicious injury to the entity itself. Consequently, NSS raises the question of whether Mr. Livingston actually injured it. After all, the jury did find in the prior state court action that NSS had incurred $1.8 million in damages as a result of Mr. Livingston's tortious interference.

NSS cites *The Spring Works, Inc. v. Sarff (In re Sarff)*, 242 B.R. 620 (6th Cir. BAP 2000). That case involved claims that the debtor's former employer, The Spring Works, had successfully litigated in state court. Spring Works received two awards. One compensated it for damages resulting from debtor's breach of a covenant not to compete, interference with its business relationships, and misappropriation of its trade secrets. The other award compensated Spring Works separately for the debtor's disloyalty.

Spring Works contended that both awards were non-dischargeable under Section 523(a)(6). The bankruptcy court agreed with respect to the first award. However, the bankruptcy court declared that the second award regarding the debtor's disloyalty did not fit within the exception provided by that subsection.

The Sixth Circuit bankruptcy appellate panel reversed, determining instead that Spring Work's disloyalty claim against the debtor was also excepted from discharge because of Section 523(a)(6). In reaching its decision, the panel focused on the willful and malicious nature of the debtor's behavior. However, equally important was the panel's implicit, if not explicit, recognition that the debtor's willful and malicious conduct was in and of itself enough to warrant a declaration of nondischargeability under Section 523(a)(6) for whatever damage Spring Works had suffered.

> The magistrate awarded compensatory damages based on her previous findings that Sarff's actions were a willful and deliberate breach of his contract of service. **Those actions indicate an intention to cause Spring Works economic injury by taking customers from Spring Works. Accordingly, the compensatory damage award in the judgment is nondischargeable under § 523(a)(6).**

*Id.* at 628 (emphasis added).

In effect, then, *Sarff* stands for the proposition that any intentional tort may be the basis for a declaration of non-dischargeability under Section 523(a)(6) so long as the victim has suffered financially at the tortfeasor's hands.

*Sarff* cites *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), as support for its conclusion. *Geiger*, of course, is the authoritative case con-

cerning the meaning of "willful and malicious" in the context of Section 523(a)(6). It is ironic, then, that it was in *Geiger* that the Court also emphasized that "courts should not adopt interpretations of a congressional enactment which would render superfluous another portion of that same law." 523 U.S. at 62, 118 S.Ct. at 977 (citing with approval *Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 837, 108 S.Ct. 2182,2189, 100 L.Ed.2d 836 (1988)).

The problem with *Sarff* is that it renders the second reason for non-dischargeability under Section 523(a)(6), that being "willful and malicious injury ... to the property of another entity" superfluous. For example, assume that the debtor in *Sarff* had also destroyed some of Spring Works' equipment. Would not the damage suffered by Spring Works as a consequence of this intentional conduct also warrant under *Sarff's* reasoning a declaration of non-dischargeability within the "injury to an entity" aspect of Section 523(a)(6)? In other words, would not the intentional destruction of the equipment manifest "an intention to cause Spring Works economic injury" thereby making "the compensatory damage award ... non-dischargeable under § 523(a)(6)?" *Sarff,* 242 B.R. at 628. But, if that is so, what purpose is served by including injury to the entity's property as a second basis for denying dischargeability under Section 523(a)(6)? Is there any reason to distinguish between (1) striking the victim, (2) vandalizing the victim's car, and (3) intentionally interfering with the victim's business prospects if, as *Sarff* holds, the victim himself will have inevitably suffered an "economic injury" in each instance?

■ I ask these questions mindful as well of the admonitions that exceptions to discharge are to be construed narrowly in favor of the debtor, *Equitable Bank v.*

*Miller (In re Miller),* 39 F.3d 301, 304 (11th Cir.1994) and that exceptions otherwise "should be confined to those plainly expressed." *Geiger,* 523 U.S. at 62, 118 S.Ct. at 977 (quoting from *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915)). It is appropriate, then, to look more closely at the actual language of Section 523(a)(6).

The prepositions "by" and "to" stand out.

> (a) A discharge under ... this title does not discharge an individual debtor from any debt—
>
> (6) for willful and malicious injury **BY** the debtor **TO** another entity or **TO** the property of another entity.

11 U.S.C. § 523(a)(6) (emphasis added).

"By," as used in this context, means "through the agency or instrumentality of" and "to," as also used in this context, is a function word to indicate "the receiver of an action or the one for which something is done or exists." Webster's Ninth New Collegiate Dictionary (1989).

■ *Sarff's* interpretation of Section 523(a)(6) is clearly too broad. The words chosen by Congress do not permit its application to depend simply upon whether the victim of an intentional tort has suffered a financial loss. Rather, Section 523(a)(6) requires the claimant to establish that the debtor's tort actually caused injury TO the claimant or TO his property. Vandalism fits within this subsection because it involves damage TO property BY the debtor. Battery (*i.e.* the tort of physically assaulting a person) fits because it involves injury TO the victim himself BY the debtor.

Of course, Section 523(a)(6) applies only if the debtor's vandalism or assault also resulted in economic harm to the debtor. But the same can be said for any exception under this section. That is why Section

523(a) prefaces all of the exceptions with the statement "[a] discharge under Section 727 ... does not discharge an individual debtor from any **DEBT**." (Emphasis added). Obviously, mere entitlement to an economic recovery is not enough to establish non-dischargeability under Section 523(a)(6) any more than it is enough to establish non-dischargeability under Section 523(a)(4). The victim must also show under Section 523(a)(6) that the debt was for willful and malicious injury to the victim or the victim's property, just as a victim must show under Section 523(a)(4) that his claim against the debtor arose because of fiduciary misconduct, embezzlement or larceny.

Mr. Livingston's tortious conduct with respect to NSS' consultants well illustrates the limits of the Section 523(a)(6) exception. The jury clearly determined that Mr. Livingston had acted willfully and maliciously when he convinced two of the consultants to begin doing business with his new company while still in NSS' employ. There is also no question that NSS suffered a substantial loss because of Mr. Livingston's deceit. However, Mr. Livingston's misconduct did not harm NSS per se; rather, it harmed the relationships NSS enjoyed with its consultants. Consequently, if NSS' interference claim against Mr. Livingston is to be non-dischargeable

under Section 523(a)(6), it must fall within the injury to property portion of that subsection. But, as already discussed, the relationships Mr. Livingston unlawfully targeted were too informal to constitute NSS' property. Therefore, NSS' claim against Mr. Livingston for tortious interference cannot be excepted from discharge under Section 523(a)(6).

Congress may not have intended this distinction when it enacted Section 523(a)(6). Perhaps Congress all along intended to include within this subsection's scope all claims arising from a debtor's intentional and malicious conduct However, my duty is to enforce the Bankruptcy Code as it is written. *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). *Sarff's* broad interpretation of Section 523(a)(6) fails because it renders a portion of that subsection superfluous. If "injury ... to the property of another" is to have any meaning, a narrower interpretation of Section 523(a)(6) is required.[11]

Therefore, were it not for *Sarff,* I would dismiss without further consideration NSS' Section 523(a)(6) count as well. However, the question remains as to whether I am bound to accept *Sarff's* much broader interpretation of that subsection.

---

**11.** Section 523(a)(6) does not distinguish between natural persons (*i.e.,* individuals) and other persons who might be an entity within the meanings of Sections 101(15) and (41). It is fair then to ask how a corporation or other non-corporeal entity may itself be injured. Put differently, if only natural persons are capable of being injured, why did not Congress say so by limiting injuries to the person to only "individuals?"

Corporations and other legal fictions, though, do have reputations and those reputations are no less subject to libel and slander than an individual's reputation. *See, e.g., Northland Wheels Roller Skating Center, Inc. v. Detroit Free Press, Inc.,* 213 Mich.App. 317,

328, 539 N.W.2d 774 (1995); *Heritage Optical Center, Inc. v. Levine,* 137 Mich.App. 793, 797–98, 359 N.W.2d 210 (1984). Moreover, one would be hard-pressed to exclude libel and slander from the willful and malicious conduct that Congress intended Section 523(a)(6) to cover. Indeed, the Sixth Circuit has held that claims based upon defamation are non-dischargeable under this subsection. *Kennedy v. Mustaine (In re Kennedy),* 249 F.3d 576, 581–82 (6th Cir.2001). Therefore, it would seem that Congress' decision to include both corporeal and non-corporeal entities within the "injury to" portion of the Section 523(a)(6) exception was well considered.

## D. *Stare Decisis.*

█ Virtually all of the case law regarding the precedential value of bankruptcy appellate panel decisions is from the Ninth Circuit.[12] Two Ninth Circuit bankruptcy appellate panels have determined that their decisions are binding. *In re Windmill Farms, Inc.*, 70 B.R. 618 (9th Cir. BAP 1987) and *In re Proudfoot*, 144 B.R. 876 (9th Cir.BAP1992). Most Ninth Circuit bankruptcy courts have also reached this conclusion. *See, e.g., In re Tong Seng Vue*, 364 B.R. 767 (Bankr.D.Or. 2007); *Coyne v. Westinghouse Credit Corp. (In re Globe Illumination Co.)*, 149 B.R. 614 (Bankr.C.D.Cal.1993). However, *In re Standard Brands Paint Co.*, 154 B.R. 563 (Bankr.C.D.Cal.1993) holds to the contrary. *See also*, March and Obregon, *Are BAP Decisions Binding on Any Court?*, 18 Cal. Bankr.J. 189 (1990).

The debate in the Ninth Circuit has focused upon whether the "bankruptcy appellate panel service" authorized under 28 U.S.C § 158(b)(1)[13] is a superior court within the accepted principles of stare decisis. Absent, though, from the debate is any significant discussion concerning the doctrine itself. Both sides simply assume that stare decisis applies. However, if stare decisis does not apply, then it makes no difference whether a bankruptcy appellate panel service is a superior court or not. Therefore, examining the doctrine of stare decisis, especially as it relates to modern courts, is worthwhile.

Stare decisis finds its roots in medieval England. When the Plantagenets assumed the throne, the administration of justice within the realm was largely a function of each locale's customs. Henry II, though, encouraged the development of a "common" law by sending out judges from his own court to hear disputes throughout the land. Each judge would then share what he had heard with his colleagues before rendering a written opinion. These opinions, over time, became the basis upon which subsequent cases were decided. If the facts in a particular case were the same as those in a previously published opinion, then the law applied in the prior case dictated the outcome in the immediate case as well. If, however, the new case presented a distinguishable situation, the judge would publish for future reference a new opinion that further refined the common law. And so, the doctrine of stare decisis became associated with English jurisprudence. Stare decisis literally means "to stand by things decided." The common law and other judicially created legal systems could not exist without it being an integral part of the system. Stare decisis is indeed the mortar that holds judge-made law together.

Colonial America continued the common law tradition and, with it, the doctrine of stare decisis. The American Revolution, though, overhauled the status quo. Popularly elected legislatures, both at the federal and state levels, have replaced the judiciary as the primary source of American law.[14] Consequently, judges today sel-

---

12. The principal non-Ninth Circuit case is *In re Carrozzella & Richardson*, 255 B.R. 267, 272–73 (Bankr.D.Conn.2000). It holds that BAP opinions are not binding because they should be given no more precedential weight than a decision of a district court. *See also, In re Williams*, 257 B.R. 297, 301 n. 5 (Bankr. W.D.Mo.2001); *In re Virden*, 279 B.R. 401, 409 n. 12 (Bankr.Mass.2002).

13. Specifically, the judicial council of a circuit is authorized to "establish a bankruptcy appellate panel service comprised of bankruptcy judges of the districts in the circuit ... to hear and determine, with the consent of all parties, appeals under subsection (a) [28 U.S.C § 158(a)] ...."

14. The common law, of course, has not been replaced altogether. For example, the Michigan Constitution provides that "[t]he common

dom make law; rather, they for the most part interpret and enforce statutes enacted by the legislatures. Indeed, the Supreme Court, in the venerable case of *Erie R. Co. v. Tompkins*, declared that "[t]here is no federal general common law," and that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." 304 U.S. 64, 78, 58 S.Ct. 817, 823, 82 L.Ed. 1188 (1938). In other words, the federal courts, unlike their medieval English counterparts, have no inherent authority to create law. Their responsibility is simply to interpret what has been created elsewhere, whether at the federal or state level.

I make these observations because most discussions concerning stare decisis look back to common law notions that have long been abandoned. *Allegheny General Hospital v. NLRB* is a good example.

> The essence of the common law doctrine of precedent or Stare decisis [sic] is that the rule of the case creates a binding legal precept. The doctrine is so central to Anglo–American jurisprudence that it scarcely need be mentioned, let alone discussed at length. A judicial precedent attaches a specific legal consequence to a detailed set of facts in the adjudged case or judicial decision, which is then considered as furnishing the rule for the determination of a subsequent case involving identical or similar material facts and arising in the same court

or a lower court in the judicial hierarchy.

608 F.2d 965, 969–70 (3rd Cir.1979)(citing R. Aldisert, *The Judicial Process*, 777–801 (1976) and the collected observations of Henry Campbell Black, Sir William Blackstone, John Hanna, Roscoe Pound, Richard A. Wasserstrom, Rupert Cross, Herman Oliphant, and Thomas S. Currier.).[15]

Stare decisis, of course, still plays a role in American jurisprudence. The Supreme Court itself has stressed its continued importance.

> By affirming the District Court decision after our decision in *Rummel [v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980)], the Court of Appeals sanctioned an intrusion into the basic line-drawing process that is "properly within the province of legislatures, not courts." More importantly, however, the Court of Appeals could be viewed as having ignored consciously or unconsciously, the hierarchy of the federal court system created by Constitution and Congress [U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.

*Hutto v. Davis*, 454 U.S. 370, 376–77, 102 S.Ct. 703, 705–6, 70 L.Ed.2d 556 (1982).

■ But the Supreme Court has made it equally clear that modern stare decisis is a judicial policy, not a law. *Payne v.*

---

law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed." Mich. Comp. Laws. Const. art. III, § 7.

15. *See also, U.S. v. Mitlo*, 714 F.2d 294, 298 (3rd Cir.1983) ("Certain principles of the common law tradition, as distinguished from the Continental civil law tradition, bind both the district courts and the courts of appeals in

the federal judicial hierarchy."). However, *Mitlo's* reasoning ignores the fact that significant aspects of American jurisprudence are now governed by codes (*e.g.*, bankruptcy, commercial law, criminal law). Consequently, it is fair to ask why courts should not at least give some consideration to civil law traditions when they are called upon to enforce such comprehensive legislative enactments.

*Tennessee,* 501 U.S. 808, 828, 111 S.Ct. 2597, 2609–10, 115 L.Ed.2d 720 (1991), *Planned Parenthood of SE Pennsylvania v. Casey,* 505 U.S. 833, 854, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992), *Hohn v. U.S.,* 524 U.S. 236, 251–52, 118 S.Ct. 1969, 1977, 141 L.Ed.2d 242 (1998).

■ Policies exist, though, only because institutions adopt them. They also exist only so long as the institution desires. The judicial policy of stare decisis is no exception. Modern stare decisis does not exist apart from the court. It exists only at the court's pleasure. For example, the Supreme Court itself decides what weight it will give to its prior decisions.

Stare decisis is not an inexorable command; rather, it "is a principle of policy and not a mechanical formula of adherence to the latest decision."

*Payne,* 501 U.S. at 828, 111 S.Ct. 2597 (quoting from *Helvering v. Hallock,* 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604 (1940)).

Fortunately, there is no absolute rule against overruling prior decisions. *Brown [v. Board of Education]* itself stands as a testament to the fact that we have a living Constitution. And where it becomes clear that a wrongly decided case does damage to the coherence of the law. overruling is proper.

Lewis J. Powell, *Stare Decisis and Judicial Restraint,* Journal of Supreme Court History (1991).

■ Indeed, how the Court applies its stare decisis policy varies depending upon the matter involved. The Court gives considerable deference to stare decisis when political controversies, property rights, and commercial transactions are at issue. *Bush v. Vera,* 517 U.S. 952, 985, 116 S.Ct. 1941, 1964, 135 L.Ed.2d 248 (1996) (political controversies); *State Oil Co. v. Khan,* 522 U.S. 3, 118 S.Ct. 275, 284, 139 L.Ed.2d

199 (1997) ("Considerations of stare decisis are at their acme in cases involving property and contract rights"); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 549, 115 S.Ct. 2322, 2334, 132 L.Ed.2d 462 (1995) (Stevens, J., dissenting) (commercial transactions). However, its policy is much more flexible when either procedural issues or constitutional issues are involved. *See, Hohn v. U.S., supra* (procedural issues), *Agostini v. Felton,* 521 U.S. 203, 235, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (constitutional issues).

The federal circuit courts have emulated the Supreme Court by adopting similar policies concerning the precedential effect of their own decisions. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc) well illustrates this point. In *Bonner,* the newly formed Eleventh Circuit was called upon to decide whether it should give any precedential value to Fifth Circuit decisions rendered prior to its separation from that circuit. *Bonner* first observed that the circuits were not consistent with respect to the policies they had adopted.

The various circuits differ somewhat in the extent to which they treat their own decisions as binding on themselves. Some appear at times to treat their own decisions as merely persuasive; others by rule or practice permit one panel to overrule another after prior notice to all judges of what is proposed, followed by no objection. The old Fifth followed the absolute rule that a prior decision of the circuit (panel or en banc) could not be overruled by a panel but only by the court sitting en banc.

*Id.* at 1209.

*Bonner* then recognized that the Eleventh Circuit had the option of adopting no policy at all.

Theoretically, this court could decide to proceed with its duties without any prec-

edent, deciding each legal principle anew, and relying upon decisions of the former Fifth Circuit and other circuit and district courts as only persuasive authority and not binding.

*Id.* at 1211.

The Sixth Circuit, like most other circuits, treats a panel's decisions, if published, as binding upon all subsequent panels faced with the same issue. Nothing in the law, though, requires this outcome. Rather, it is simply the policy that the Sixth Circuit has agreed upon through the adoption of a local rule. *See,* Sixth Circuit Rule 206(c). Nor is it the only policy concerning stare decisis that the Sixth Circuit could have adopted. In comparison, the Seventh Circuit permits a subsequent panel to overturn precedent set by a prior panel provided that a "compelling reason" is shown. *Russ v. Watts,* 414 F.3d 783, 788 (7th Cir.2005).

It is also understood that district courts and bankruptcy courts within this circuit are bound by published Sixth Circuit decisions. However, this understanding is simply a logical extension of what the Sixth Circuit has expressly adopted as its policy concerning stare decisis. It would make little sense for a lower court to ignore Sixth Circuit precedent if the Sixth Circuit panel reviewing the appeal of that decision is itself bound by Rule 206(c) to follow that precedent. If, on the other hand, the Sixth Circuit decided to revoke Rule 206(c), the binding effect of its decisions upon the lower courts would not be so evident Indeed, the Sixth Circuit undoubtedly would have to adopt in short order some new rule to guide the lower courts whenever panels disagreed. Otherwise, an administrative nightmare could ensue.

This, then, is the environment within which the bankruptcy court must function as an inferior court within the federal judicial system. Policy, not the common law, dictates what precedential value is to be given to decisions of the Supreme Court and the pertinent court of appeals. Analogy can certainly be made to the common law tradition of stare decisis. However, the amount of deference a bankruptcy court must give to a superior court's decisions is ultimately determined by whatever policy the superior court chooses to adopt.[16]

A superior court's policy concerning stare decisis, though, is not the only constraint upon a bankruptcy judge's freedom to decide. To the point, the United States Constitution itself requires that all federal judicial officers swear or affirm their duty to support the Constitution. U.S. CONST. art. VI, cl. 3.[17] Given that Congress, not

---

**16.** It is generally accepted at the district court level that a decision of one district judge is not binding upon other district judges in the same district. *See, e.g., Starbuck v. City and County of San Francisco,* 556 F.2d 450, 457 n. 13 (9th Cir.1977). Courts have also concluded that the decision of a single district court judge in a multiple judge district is not binding upon the bankruptcy court for that district *First of America Bank v. Gaylor (In re Gaylor),* 123 B.R. 236, 242 (Bankr.E.D.Mich.1991); *In re Shattuc Cable Corp.,* 138 B.R. 557, 565–67 (Bankr.N.D.Ill.1992). However, these conclusions have been reached in the absence of any rule to the contrary. It certainly stands to reason that a district court itself could also adopt a stare decisis policy. For example, a district court, through an en banc order, could conceivably direct its judges to accept as binding whatever a particular district court judge may have previously decided in a published opinion entered in connection with its appellate review of a bankruptcy order under 28 U.S.C. § 158(a).

**17.** The required oath is:

I, XXX XXX, do solemnly swear (or affirm) that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform

the judiciary, is the branch authorized under the Constitution to enact federal law, it follows that every federal judge, from Supreme Court justice to bankruptcy judge, is bound by solemn oath to enforce the laws Congress has enacted. This duty is particularly evident with respect to bankruptcy laws, for not only does Congress have the exclusive authority to enact such laws, U.S. Const. art. 1, § 8, cl. 4, but Congress has also chosen to exercise that authority by enacting a comprehensive code. Indeed, the bankruptcy courts themselves exist only because Congress has created the same to enforce the bankruptcy laws it has enacted. 28 U.S.C. §§ 151 and 157.

Ideally, a judge's constitutional duty to honor Congress' enactments as it has written them will always coincide with the judge's separate obligation to defer to a superior court's policy concerning stare decisis. However, there are inevitably occasions when a judge's own good faith interpretation of a statute conflicts with a superior court's interpretation. Indeed, as the Supreme Court itself acknowledges, there are occasions when its interpretation, as opposed to the lower court's interpretation, is the one that is incorrect. Nonetheless, the Supreme Court's policy on stare decisis still requires the inferior court to defer to its interpretation, no matter how mistaken the Court might be. *See, e.g., Patterson v. McLean Credit Union,* 491 U.S. 164, 172–173, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989). *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 423–24, 106 S.Ct. 1922, 1930–31, 90 L.Ed.2d 413 (1986).[18]

I acknowledge my station within the federal judicial hierarchy. Consequently, I have no choice but to accept whatever policies have been adopted by superior courts. In my case, the policies of both the Supreme Court and the Sixth Circuit require that I accept their interpretations of the Bankruptcy Code regardless of whether my own interpretation may be different.[19] However, the Sixth Circuit has not yet adopted any policy concerning the binding effect of bankruptcy appellate decisions.[20] Therefore, I am not obligated

---

all the duties incumbent upon me as XXX under the Constitution and laws of the United States. So help me God.
28 U.S.C. § 453.

**18.** Justice Powell did caution, though, against putting too much reliance upon such a view:

It [relying upon Congress to react to a mistaken interpretation] reflects an unrealistic view of the political process and Congress's ability to fine tune statutes.
Powell, *Stare Decisis and Judicial Restraint,* 1991 Journal of Supreme Court History.

**19.** My acceptance of this reality does not, however, mean that my opinion is irrelevant. To the contrary, my separate duty to support the Constitution requires at a minimum that I express my disagreement with the superior court's decision, especially in those instances where it appears that the superior court may have missed a dispositive issue. Mistakes can be made even at the appellate level. Such mistakes, though, cannot be corrected simply by appellate fiat. Correction is possible only if the issue is presented again on appeal. An inferior court has no choice but to follow binding appellate precedent. However, a lower court's dissent, if you will, regarding that precedent may still prompt the losing party to return the issue to the appropriate appellate body for further review.

**20.** The Sixth Circuit bankruptcy appellate panel service is governed by its own set of local rules. Rule 8013–l(b), which permits a panel to limit the precedential value of an opinion to the particular case and its parties, certainly suggests that subsequent Sixth Circuit bankruptcy appellate panels are bound by previously published Sixth Circuit BAP opinions. However, it does not follow that a bankruptcy court's refusal to also accept Sixth Circuit BAP opinions as binding will inevitably lead to reversal, as would be the case if the bankruptcy court were to ignore

under the modern view of stare decisis to treat *Sarff* as binding precedent.[21]

 Of course, a bankruptcy appellate panel decision should not be simply ignored, anymore than a case on point from another circuit should be ignored. However, accepting non-binding authority is a matter of comity, not a matter of policy. Indeed, *Moore's* has used the word "notion" to describe comity. 18 *Moore's Federal Practice*, 134.02[1][d]. The reasons for comity are the same as for stare decisis. Comity lends itself to uniformity and ease of judicial administration. However, unlike stare decisis, no superior court has imposed it as a policy that must be followed. Therefore, there is no justification under comity alone to set aside what is otherwise a judge's sworn duty under the Constitution to enforce Congress' enactments as written. If a judge is to adopt another's interpretation of the Bankruptcy Code as his own, it should be because that interpretation is persuasive, not because it is merely prior in time.

I disagree, then, with the bankruptcy judge who described his colleagues' refusal to follow bankruptcy appellate panel decisions as "wrong" and "shameful." *Muskin, Inc. v. Industrial Steel Co., Inc. (In re Muskin)*, 151 B.R. 252, 254 (Bankr. N.D.Cal.1993). To disagree is not, as he would have it, an expression of ego; rather, it is merely deference to duty. Moreover, thoughtless acceptance of comity and stare decisis is dangerous. Each works well only if the seminal decision correctly interpreted what the legislature had enacted. However, if the original interpretation is wrong, then these doctrines stifle the possibility that the error will ever be addressed.

I do not suggest by these comments that courts should no longer view judicial consensus as a desirable goal. However, as Judge Posner observed in *Colby v. J.C. Penney Co., Inc.*, consensus is best achieved at the circuit level.

The reasons we gave for giving some though not controlling weight to deci-

the Sixth Circuit's own published opinions. Appeals to the Sixth Circuit bankruptcy appellate panel service can be made only from those districts within the circuit that have elected to utilize the service. 28 U.S.C. § 158(b)(6). Therefore, a bankruptcy court in a "non-opting" district would be indifferent to whether subsequent Sixth Circuit bankruptcy appellate panels are bound or not by Rule 8013–1(b). Appeals of that bankruptcy court's decisions would in all cases go to its district court instead. Indeed, reversal in a district that does permit appeals to the Sixth Circuit bankruptcy appellate panel service is not inevitable, for appeal even in those instances can be made to the BAP service only when all of the parties have consented. 28 U.S.C. § 158(b)(1).

21. A concurring opinion in *Bank of Maui v. Estate Analysis, Inc.*, 904 F.2d 470 (9th Cir. 1990), suggests that the circuit must in fact issue an order or adopt a rule if BAP decisions are to be binding on lower courts. The panel in *Maui* concluded that the appellant

had not violated Rule 9011 notwithstanding a Ninth Circuit BAP decision that was inconsistent with the appellant's position because the Ninth Circuit had not decided whether such decisions were binding. That comment prompted Judge O'Scannlain to write:

I concur in the opinion of the court, but write separately to propose that the Judicial Council of this Circuit consider adoption of an order requiring that Bankruptcy Appellate Panel (BAP) decisions shall bind all of the bankruptcy courts of the circuit, subject to the restrictions imposed by article III so well discussed in the opinion.

*Id.* at 472.
Whether such a rule or order would be constitutional is also an issue.

There is something odd and unseemly, if not unconstitutional, in the prospect of three Article I judges creating for constituent bankruptcy courts-and perhaps, district courts as well-the law of one or more circuits.

*In re Carrozzella & Richardson*, 255 B.R. at 273.

sions of other federal courts of appeals do not apply to decisions of other district courts, because the responsibility for maintaining the law's uniformity is a responsibility of appellate rather than trial judges and because the Supreme Court does not assume the burden of resolving conflicts between district judges whether in the same or different circuits.

811 F.2d 1119, 1124 (7th Cir.1987).

Bankruptcy courts, on the other hand, must continue to serve as crucibles for new ideas and approaches. Deference to binding authority, of course, is obligatory and consideration of non-binding decisions is always well advised. However, neither can serve as an excuse to forgo testing and questioning what has already been decided. If the system is to work, each bankruptcy judge must continue to critically analyze the Bankruptcy Code even in the face of binding precedent so as to ensure that the circuits have thoroughly vetted whatever they may ultimately decide upon as their final interpretation.

## CONCLUSION

In summary, I conclude that neither Section 523(a)(2)(A) nor Section 523(a)(4) excepts NSS' claim against Mr. Livingston from his discharge. As for Section 523(a)(6), I recognize that the bankruptcy appellate panel in *Sarff* reached a conclusion different from the one I have. However, with all due respect, I believe that the panel misinterpreted Section 523(a)(6) and it is my duty to voice my disagreement Moreover, no superior court has directed that I adopt *Sarff* as binding precedent. Consequently, I have applied Section 523(a)(6) consistent with how I believe it must be interpreted.

Therefore, for the reasons stated, judgment must enter in favor of Mr. Livingston. A separate order consistent with this opinion will be entered.